Case number 24-2143 from the Western District of Missouri, Rhonda Burnett et al. v. James Mullis, etc. All right, please step forward Mr. Booker. Couple of things before we get started. If you get to zero on your clock and you keep talking, you're taking somebody else's time and if you keep talking after that, say everybody runs long 42 seconds, at the end the last person will not have an argument and you'll have lost any rebuttal you hope to preserve. So please pay particular attention to the clock. Thank you. Thank you, Your Honor, and may it please the court. As you've obviously noticed, there are a lot of arguments to be made in this case, but there's a little bit of factual table setting that I think is important to understand why the class settlement in this case is so extraordinary and why it therefore requires this variety of objections that you might not see in a less extraordinary case. So this is a case that arises from a settlement, really, the underlying case not so much, that arises from a series of combinations and restraint of trade in violation of the Sherman Act. Specifically, realtors, their trade association, and multi-lists, which is a listing service, created a set of rules and practices that would, in effect, set buyer-broker commissions to the detriment of home sellers, and there'll also be some argument regarding home buyers. Now there were versions of this conspiracy happening all over the country, and our clients have a case regarding that in Pennsylvania, there's one in New York, there's one in South Carolina. You'll hear from some of those folks, too. But the case here involved six realty companies, four listing services, and the National Association of Realtors. That's the trade group I mentioned. Only related to the Missouri conspiracy, and it went to trial, and a jury awarded $1,785,000,000 to the victims just here in the state of Missouri. The Sherman Act provides for trebling, so that took it up to $5.4 billion about. And the parties now are looking to settle with essentially every harmed home seller in every one of these conspiracies, some of which are interrelated with each other, some of which are pretty distinct, all across the country for less than the bottom line pre-trebling amount awarded for just the Missouri home sellers. As I count it, it now stands at about $1.78 billion in proposed settlements, some of which haven't been approved by the district court yet, but will be coming up for approval. So $700 million less for everybody across the whole country than what the jury found was the damages, not the treble damages, for Missouri homeowners. Missouri is a mid-sized state, a little under 2% of the population. So it makes the math a little bit easy, 50 states, 2% of the population. So we're talking about in excess of a quarter of a trillion dollars in likely treble damages across the whole country being settled for $1 billion. Even if you're to take out the trebling, we're talking about a case where we are at a penny on the dollar. So what legal argument does this latch into? I understand the background, but it's in the briefs. Right. So what that leads us into is the consideration of the Rule 23E factors, because those are all about identifying whether the settlement is fair to the class members. Now we've got all of these class members all over the country who were no part of this up until the time that the settlement started. All of whom, I think Professor Monestier in her briefing, her estimate was that it would come to something like $16 per $10,000 of harm. So the legal connection is that the court, and it's important to say the court because there has been a lot of briefing here in this case that talks about the objectors having supposedly failed to do timely discovery, although there was no actual discovery deadline, or having waived an issue, or having made a poor argument. The problem there is the responsibility doesn't lie with the objectors. The responsibility lies first, last, and always with the court under Rule 23E to determine whether a settlement is fair and equitable to all of the class members. So the legal importance is that there are class members all over the country losing large amounts of money. Large amounts of money that are a portion of the most valuable asset that most of them will ever own as a result of this extraordinary diminution. Counsel isn't, to some degree, you're going to always have this when there is a settlement. That's part of giving up the opportunity for a greater return, a potential return, in order to achieve a resolution of the dispute on a large scale. That's what class action settlements typically involve. Well, Judge Smith, I certainly agree with that. The way a settlement works is everybody takes a haircut, and I understand that. But we're talking about a pennies-on-the-dollar amount for this very large nationwide class. Counsel, if the case resulted in the type of damages that the Missouri case portended across the country, the effect on the various defendants could be bankruptcies and economic destruction that would essentially hold the potential for reducing what anyone gets. And that is a part of the Van Horn factors, Judge Smith, and I'm glad you bring it up because this is a situation where the proponents of the settlement can present that evidence. They can present that evidence to the class. They can present that evidence to the court. What they did here was they presented a declaration. They presented a declaration by an obviously interested party, the law partner of one of class counsel, and that was the only evidence that they presented that a larger settlement would have that kind of effect. Even though that's the only evidence, it appears that the district court credited it. Does that matter? Because if it's a factual finding, then it's before us on clear error. There is a distinction, and I think that this distinction is important in a number of places, when it comes to the settlement of a class action because the clear case law in this circuit is that the judge has a fiduciary duty to ensure that the settlement is equitable and fair and treats absent class members fairly, produces a good result for them. This is not the same as an ordinary factual determination in that way. Thank you. Mr. Layton, your time has expired. Good morning, and may it please the court. Mr. Booker talked about this kind of geographical expansion. Counsel, I may be behind my colleagues here, but if you would just note who you represent. I represent the Mullis. Okay, thank you. Thank you. There's a lot of you. I understand that. Thank you. On behalf of Mr. Mullis, I want to talk about the expansion, the settlement's expansion of claims, not geography. I'm going to take a little diversion at the beginning and give you something about me. In 2017, when I retired from the Attorney General's office, I sold my house in Jefferson City. Two years later, I bought a house in St. Louis. Those are two separate transactions, two different transactions. There were different contracts, different brokers involved, but different contracts. The objective that I had as a seller is not the same objective that I have as a buyer. I didn't have the same knowledge of the seller's arrangement with the broker when I bought as I did when I sold. This case, until the settlement or after, was always a sales case, not a buyer case. It was tried as a sales case. And there are, aside labels of copycat cases, there are these other cases that are also sales cases. But Mullis' case was not that kind. Mullis' case addressed buyers, buyers who, like me in 2019, had different interests in different transactions. In our view, the settlement did not actually include purchase claims because they don't have the same factual predicate as seller's claims. And if it did, the releases were overbroad. If they weren't overbroad and it included them, then we get to the question of whether it was fair and reasonable to proceed as they have in a way that really doesn't give any value at all to the buyer's claims, even though the class has people who bought and sold and people who only sold. Mr. Mullis was part of a class action in Illinois. That class action was brought before the trial and settlement here. It survived motions to dismiss. It was narrowed. It no longer has a Sherman Act claim. And this is, according to the parties on the other side, a Sherman Act case. It doesn't have that because Illinois BRIC says that if you're an indirect purchaser of the services, like these buyers are of services or brokers, then you can't rely on the federal law. And so there are state law claims. It wasn't pulled into the multidistrict litigation. Multidistrict panels work on this case in part because the folks who were trying the case said, oh, it's different. Don't bring it in. It's different. Now, there are great class lawyers in this case. They had an amazing success and they made a considerable investment. But they chose all along to only address the seller claims. And why? Well, there's at least one legal reason and a factual reason. And the legal reason is that they would be Illinois BRIC repealer claims under state law, a different set of legal standards. And by the way, Missouri's never had an Illinois BRIC repealer. And so the claim we have in Illinois is not the claim that we would have in Missouri where this case started and where it was pled. And then there are the factual claims. Because the issues that would be raised if I were to seek relief on my 2019 purchase are not the same issues, the same factual questions that would arise for the seller. Sure, there's some overlap. We can't deny that. Don't want to deny that. But the issues are different. The nature of damages is different. Yet the district court concluded that this particular settlement covers our claims. That is, the buyer's claims as well as the seller's claims, even though the settlement agreement itself says nothing expressly about that. Nor did actually the initial notice that was sent to class, although that evolved over time after we asserted our objection from Mr. Mullis. The claim form all the way through, even through the latest ones of these settlements, asks nothing about purchases. It provides no information about purchases. It is solely as to sales. So the question becomes, when the settlement agreement says it's going to release claims with the same factual predicate, what does that mean? And there's not a bright line here, but this court has the opportunity or the obligation to look at that phrase and decide, is it going to define it broadly, as the district court did, and thus, in essence, invite people to come to our circuit. If they want to take advantage of that broad reading of that standard, or is it going to draw it narrowly? Keeping it on a transaction basis... Counsel, this is Judge Smith. Would you help me with what the district court... What's the error of the district court in consideration of your client's interests and why it should prevent this settlement from being affirmed? So first, misinterpreting the settlement agreement to actually cover the buyer claims. If that's not an error, then the error is in allowing it to cover the buyer's claims, even though they are separate, distinct transactions with a different set of criteria. And if you think that's okay, then we still have the problem of, we have this limited fund that's been created. It's going to be allocated among those who have submitted claims, and yet it is evident from the history of this case in the claim form that the same is going to be handed out pro rata to everyone who sold a house. Not to people who also purchased a house, getting something in addition. Basically, it completely writes off the value of the claims that we want to litigate in the district in Illinois. Does the record contain what that valuation would be and its effect upon the settlement agreement? No, because that hasn't been tried yet. This case was always tried as a seller case, and so the record in this case is all about the value of sales. It doesn't have information about the value of purchases and the Illinois brick repealer claims because that was never part of this case. Thank you. Thank you.  Is it Mr. Howe? Rebahal? What's your name, sir? No, I thought I was supposed to go next. Is it? No. No. Yeah, I think Mr. McCrate is supposed to go next, unless I'm trying to figure out who's whom. You better say who you are and why you're here. It's kind of like who's on first here. It is a little bit, Your Honor. My name is Scott McCrate, and I represent the plaintiff class. To start out addressing a few of the things Mr. McCartle said as to how we got here with these settlements amounts, the district court took into account the fundamental practical reality of the case, which is that these settlements got the extraordinary relief in the face of risk that included both litigation and financial risk. When we settled first with Anywhere and REMAX, we were just days away from trial in Burnett, and we were confident, but no one ever knows how a jury trial will turn out. And then it was far from over once we won. We had post-trial motions, certain appeals to this court, likely cert petition, the companion moral case, and 20 other markets remained to be tried. And most disturbing of all, we had the fact that none of these defendants could afford to pay the Burnett verdict, approximately $1.8 billion, trebled to $5.4 billion. And the day after that verdict came down, Keller Williams came to us and said, we've engaged Bankruptcy Council. We're actively considering it. And the other defendants were making similar overtures. So with that backdrop, what we did was to secure relief at the outer range of what the defendants could pay. Most of these defendants contributed over half their available cash. Keller Williams was in such dire straits, it had to borrow money just to make the first payment. And now, with the settlements that they've grown, the fund stands at almost $1.1 billion, which is one of the largest recoveries in antitrust history. Coupled with that, we also negotiated practice changes that eliminate these rules and make sure that the class members won't suffer the same harm in the future. And measured against the risk, that result was a home run by any standard. And the class thought so, too. You know, the class gets to vote, and they vote with their claim forms. A claim form is an eye, and if you opt out or if you object, that's kind of a nay. And in this case, we've had over two and a half million claim forms submitted against only 39 opt-outs and 36 objectors. So the class spoke loudly, and it spoke in favor of the settlements, and the district court properly exercised its broad discretion in listening to the class. I'm not sure I'm asking the right counsel here, but would you address your friend on the other side's argument about inclusion of the buyer's claims? Yes, Your Honor, absolutely. So the release here follows this court's same factual predicate standard. I mean, plaintiffs always give up releases from the same conduct. In an individual case, sometimes it's a general release. And in a class case, you can give up the claims, whether pled or unpled, that arise from the same factual predicate. So what we did when we were negotiating this and drafting these releases is we incorporated the court standard directly into the releases. And the reason why it covers buyer claims is you've got a situation here where the class members, I mean, Mr. Layton mentioned that we didn't represent buyer claims, we represented seller claims. Well, what we did is we represented people who had both claims. Most of the class both bought and sold a home. It's very common. If you sell a house, you've got to live somewhere. A lot of times, people buy a house. And so what we did was to take the TAC that would maximize the recovery, I mean, you have indirect purchaser claims, you have direct purchaser claims. What we did is to say the way to achieve the best results for these people, most of whom have both claims, is to pursue the seller TAC. And so that's what we did. And that's how we got the result of nearly $1.8 billion, whereas these other litigations, you know, got dismissed, refiled, it's a smaller claim. They've kind of struggled. So I think that kind of bears out what we did and why we did it. Now as for the releases not covering the claims, these releases cover the same rules, the same conspiracy to apply the rules by the same defendants and the same antitrust violation. And they therefore fit comfortably within a single common release. And with regard to not being able to include buyer claims, I mean, my goodness, if that were the rule, no one could ever settle a case for all their claims. You know, they would have to do some sort of serial settlement because people have common claims all the time. And then as for this idea that allocation won't include the buyers, that's still very much an open issue. I mean, the district court, because of the posture of the case, followed the standard practice in large antitrust cases with many defendants settling on a rolling basis, and it delayed that allocation process. So that's something that could be touched on below. I think they'll have a hard time doing that because I think this idea of claim by claim allocation runs directly contrary to this court's precedence, but they will be able to do that upon remand. I see I'm out of time. So yes. Thanks. Mr. Rowan. Good morning, Your Honors. May it please the court, Matthew Rowan on behalf of Keller Williams. So I want to echo what Mr. McBride said about the settlement being a very good deal given the real risks that, especially my client, as he pointed out, had to obtain financing to be able to make their first payment. But I think most of those issues either have been or will be sort of addressed throughout this morning with multiple cases, so I just want to focus with the court's indulgence on a few issues responding to Mr. McArdle and to the South Carolina objectors, who I think you'll be hearing from a little bit later. So I want to start just very briefly with the objections to the class settlement notice that the South Carolina objectors raised. The first and most important point that there wasn't a timely objection raised, the first anyone heard about this was at the fairness hearing, not in the written objections that were filed. I think that makes sense because the notice here was not only expansive, I mean, it reached upwards of 95% of potential settlement class members, and when you're talking about a 30 million person potential universe, that's extraordinarily successful. And there's no argument that the Rule 23 C2B factors weren't all satisfied in the notice. The only essential arguments they make is that the notice itself didn't include every jot and tittle of the settlement agreement, but of course there was a link to the settlement agreement, and this court's held, dating back to cases like Grunin and Petrovich and many other times, that you don't even need to do that, but given here that we had the actual settlement appended to it that explained in painstaking detail all of the practice changes to which my client had agreed, it made clear what the released claims were, what the terms of the release was, and also, you know, I think most importantly to their objection, they say, well, it should have said, with respect to Keller Williams, because this was a post-trial settlement, that it should have said that there was a trial, but of course on page one of the settlement, it says there was a trial and there was a verdict, so had the notice said that, it would have violated this court's rule under Grunin that the notice be scrupulously neutral, because of course the court had not ruled, our post-trial motion was pending at the time of settlement, but the settlement itself, which was appended to the notice, was factually accurate. So that's with respect to the notice. The only other objection they make, which I think is cross-cutting to the sort of arguments that Mr. McCardle made this morning, is with respect to my client's financial condition, and I think that they just fundamentally misunderstand what that component of the Van Horn analysis is all about. I think the premise of Mr. McCardle's and the South Carolina objector's argument with respect to the defendant's financial condition is that the district court has an independent obligation to determine whether defendants could pay a dollar more, and that's not what the factor goes to, and that's not sort of what a court's role is in overseeing the resolution of claims by a settlement. The point of the defendant's financial condition factor is for the court to make sure that the defendant can actually pay that which it has agreed to pay, and that the plaintiffs aren't going to get, at the end of the day, with a settlement that doesn't afford them any relief because the defendant can't actually pay. And here, while it was difficult for my client to actually make the payment, and they had to obtain financing, which again underscores the real risks, putting aside the appellate risks, the real sort of bankruptcy, real-world risks that would have resulted but for a settlement, it does show that here there's no question that the district court satisfied its obligations. And as you noted, Judge Erickson, it made a factual finding that the forensic accounting was credible, and that's been borne out because, again, we've made the initial $50 million payment, and so there that's satisfied. The same sort of analysis applies with respect to the discovery motion that was filed. There's no independent entitlement to discovery for objectors with respect to the defendant's financial condition. There's no case that's been cited in any court that supports that. And the last thing I'd say is that Mr. McArdle sort of mentioned that the district court has an independent obligation as a fiduciary of the absent class members to engage in essentially a freewheeling sua sponte oversight at the hearing. And I think it's just sort of mixing apples and oranges. When you're talking about a pre-packed settlement where it's the first time the district court is confronting the parties and the claims, you know, maybe you want the court to sort of do a more searching investigation. But this district judge had lived with this case for five years. He just sat through a trial. He knew the parties. He knew the players. He knew the stakes. And the objectors received all the process they were due and then some. The settlement is fair, reasonable, and adequate, and we ask the court to affirm and allow the parties the repose that they have agreed to. Thank you, Your Honors. Thank you. Mr. Van Ort. Good morning, Your Honors. I'm Aaron Van Ort. I am representing anywhere in REMACS who were the first two defendants who negotiated settlements. I'm going to focus on the Mullis objection that Mr. Layton argued, but I'm happy to address anything you like. So Mullis argues, one, the people who have both direct and indirect purchaser claims arising out of the same conspiracy can't settle them all at once. So they're not allowed to. They can't do it. Two, he says if they're allowed to, at least they need separate lawyers. Or three, if they're allowed to, at least each kind of claim has to get separately designated compensation. Those are the three arguments. Our responses are absolutely you can settle all your claims arising out of the same conspiracy. Two, you don't need separate lawyers. And three, we don't think separate compensation must be designated in the settlement, but our settlement doesn't depend on that. Paragraph 42 expressly says it's binding no matter what the allocation is. So whatever happens, whatever the courts think is fair, they can order, and it's still binding. So it doesn't hold up. I want to start with the first. Can you settle all your claims at once? Just be clear on what the claims are. These are price-fixing claims regarding real estate brokerage services. The direct purchasers are people who sold houses because they pay for the brokerage services out of the proceeds of the house. The indirect purchasers are the people who buy houses. All they buy is the house, but they say the overpriced services affected the house price, so they're the indirect purchasers. Now, a lot of people here have both claims. This is really unusual. Most antitrust cases with mass-produced products, there are wholesalers, and there are retailers, and there are consumers, and they usually don't overlap. But here, most everybody overlaps. You know, we don't have exact statistics. Everybody agrees it's most, maybe like three-quarters, have both claims. They have both direct purchaser and indirect purchaser claims arising out of the same conspiracy. That's who settled their claims. People who only have indirect purchaser claims, who only bought, they aren't part of the settlement. Nobody here is releasing a claim they don't have. Nobody here is releasing a claim somebody else had. They're releasing their own claims, and they're releasing all of them. So the rule on what you can release is the same nucleus of operative facts. That's the rule. And in an antitrust case, the same nucleus of operative facts is the conspiracy. Everything arises out of the conspiracy, whether it's direct purchaser or indirect purchaser. Now, my friend on the other side has this very narrow understanding of saying it's limited to the same transaction. That's not this court's doctrine. It's the same transaction or series of transactions. That's what the superior industries case says. How do you know it's the same series? Well, if it relates back to the same underlying predicate, it's the same series. Under their view, somebody could bring a claim for one direct purchase, see how it goes, bring a claim for another direct purchase, see how it goes, and so on. That's not what the rule is on that, and this court's clear on this. The other thing they argue is that, well, because the indirect purchaser claims weren't actively litigated here, they can't be settled. That's not the rule either. This court's case in General American Life says you get to settle all the claims that arose out of the same nucleus of facts, regardless of whether they're litigated. The Second Circuit's Walmart decision means the same, and it's obvious, Your Honor, because usually people choose to press their stronger claims and not press their weaker claims. It'd be really weird if all you could settle is your strong claims, and then the law says, no, you can't settle the weak claims, too. That's not the rule, and Walmart specifically rejected the argument that you're not allowed to settle claims you didn't press. If they arise out of the same set of facts, they have zero cases, Your Honors, holding that somebody is not allowed to settle both direct and indirect purchaser cases if they have them. They have lots of cases where there are separate classes for direct and indirect, which is fine. None of those cases say what happens when the same person has both, and we have in the record it's just commonplace for direct purchaser claims to settle everything. They said what's unusual here is because this isn't a mass market, it's unusual to agree. And let me just say, our clients in the first settlement, I negotiated them. We said, we aren't going to settle with you just on half your claims, and then let you come and sue us again. Same people. Because either set of claims is going to bankrupt us. We're either going to have one settlement or we're going to have no settlement, and the law allows that. Thank you, Mr. Van Oort. Thank you. Is it? Do we have any time? One minute. There's one minute left, and who's got it? If you may, I'd like to make one statement, and then leave it to Mr. Van Oort. Just literally one statement. All right. A series of transactions. Here there are two series. One series are the other series are purchases. Thank you. Really have to hurry here. Mr. Van Oort made a comment noting that the settlement cannot be affected by the entry of an allocation plan, which underlines the biggest problem with the court's analysis under the 23E2 factors, which was there is no allocation in the settlement agreement, in the notice, anywhere of where the money is going to go. Settlement notice needs to tell the class the material terms. What term could be more material to a member of this class than how much money am I going to get? There's no way for them to know because there is no method of distributing relief. The court couldn't have considered it because there is no method of distributing relief. Thank you. The case is submitted. The briefing has been extensive and helpful, and the court will decide the case in due course. Thank you very much for your time, gentlemen. The court will call the next case.